Following the presentation of ore tenus evidence, the trial court terminated the parental rights of the mother and father in and to their minor children, C.L.S. (a/k/a L.B.) and S.M.B. Only the mother filed a timely appeal.
In her brief the mother attempts to raise four issues. Her first issue is a constitutional attack upon the validity of § 26-18-7(a)(4), Code 1975, which allows trial courts to consider a parent's conviction of and imprisonment for a felony as grounds for termination of parental rights. We note, however, that the mother raised no such issue in the proceedings below. Constitutional issues not raised in the trial court cannot be considered for the first time on appeal.Crews v. Houston Co. Dep't of Pensions and Sec.,358 So.2d 451 (Ala.Civ.App. 1978).
As to the mother's second and third issues, we note that her brief contains no cited authority in support of her contentions as required by Rule 28(a)(5), Alabama Rules of Appellate Procedure. Therefore, those two issues are not properly before us for review. May v. State Dep't of Human Resources,512 So.2d 781 (Ala.Civ.App. 1987).
In her fourth issue, the mother argues that the trial court abused its discretion in terminating her parental rights with respect to L.B. and S.M.B.
Initially, we recognize that the maintenance of family integrity is a fundamental right and that every parent has a prima facie right to custody of his or her child. In reMoore, 470 So.2d 1269 (Ala.Civ.App. 1985). Accordingly, this right can be overcome only by clear and convincing evidence that the child's best interests would be served by permanently removing the child from the parent's custody.East v. Meadows, 529 So.2d 1010 (Ala.Civ.App. 1988). In a termination of parental rights proceeding, the best interests of the child are always the primary consideration.East.
In situations where the state is a party and is seeking to terminate parental rights, there must be a determination from clear and convincing evidence that the child is dependent.Hayes v. State Dep't of Human *Page 242 Resources, 563 So.2d 1035 (Ala.Civ.App. 1990). Secondly, the court must consider and reject all other alternatives to termination such that the court can conclude that termination is in the child's best interests.Hayes.
According to § 26-18-7, Code 1975, the trial court is given the authority to terminate parental rights if, from clear and convincing evidence, it finds that the parents are unable or unwilling to carry out their responsibilities. Some considerations which the trial court is required to use are whether the parents have abandoned the children, whether the parents have abused or maltreated the children, and whether the parents have been convicted of and imprisoned for a felony. Section 26-18-7(a), Code 1975. If the child is not in the physical custody of its parent or parents, the trial court also may consider such circumstances as whether the parents have provided material needs for the children, and whether the parents have maintained regular, scheduled visits with the children. Section 26-18-7(b), Code 1975.
In her brief, the mother concedes the dependency of the children, as found by the trial court. However, she argues that there existed less drastic alternatives than the termination of her parental rights.
At trial, Jo Hanson, a social worker for the Madison County Department of Human Resources (DHR), testified that DHR first became involved with this case in April 1988, when a counselor from L.B.'s elementary school reported possible sexual abuse committed against L.B. According to the report, L.B.'s arm had been bruised allegedly by her father, who had beaten her with a belt. Also, L.B. reported suspicious sleeping arrangements between her and her father, along with vaginal fondling by the father and forced hand manipulation of the father's penis by L.B. There also was a report of possible neglect by the parents because of the family previously living in a bread truck. This living arrangement was later admitted to Hanson by the father and the mother.
After contacting the local police, Hanson conducted follow-up interviews with the mother and again with L.B. Hanson then contacted a friend of the mother to arrange an overnight stay for the mother, L.B., and S.M.B. The father was later interviewed by Hanson and the police. Two days after the initial report of possible abuse, DHR filed a petition for temporary custody of L.B.
The interviews with L.B. revealed that her father slept in a bottom bunk bed at home while she slept in the bunk's top bed. L.B. described a three and one-half year period in which the father fondled her in the vaginal area, and on her breasts and buttocks. She also stated to Hanson that her father forced her to perform oral sex on him on numerous occasions, and that the father had attempted to penetrate her, but was unsuccessful.
Hanson testified that, during her subsequent investigation of the family, she discovered discrepancies between the information provided to her by the family and reports from government agencies around the country. According to Hanson, the mother told her that L.B. attended school in Germany for her kindergarten and first grade years because the father was stationed there by the military. Hanson also stated that the mother told her that L.B. had been born in Mobile, but the family had moved to their current home from Texas where the father was retired from the military.
In fact, Hanson was able to verify that the case number on L.B.'s alleged birth certificate actually belonged to a black male child. According to L.B.'s real birth certificate which was obtained from a fraud investigator in West Virginia, L.B. was born in Maryland under the name of C.L.S. Hanson also testified that she discovered that L.B. never went to school in Germany, the father was not retired from the military, and the family had not moved there from Texas. Hanson stated that a review of an FBI rap sheet showed that the family had lived in numerous places and that the father and the mother had used between fifteen and twenty aliases.
On cross examination, Hanson admitted that a medical examination of L.B., following *Page 243 
her report of abuse, did not reveal any vaginal evidence of sexual misconduct. The medical exam did disclose cobblestoning in L.B.'s throat which may have been caused by sinus drainage. The doctor told Hanson, however, that oral sex does not have to leave medical evidence.
According to Hanson, DHR's original plan, following the initial report of sexual abuse, was to leave L.B. in the home with the mother, after the mother assured Hanson that she would protect her children. The following week, however, Hanson received a report that, over the weekend, the mother was seen at church sitting with the father with L.B. sitting on the other side of the building. Hanson also testified that she began receiving complaints from L.B.'s school that L.B. was expressing sadness because her mother did not believe her sexual abuse allegations. In fact, Hanson stated that the mother originally signed a complaint and a case report against the father based on L.B.'s charges, but later wanted to withdraw it because she was having doubts as to L.B.'s truthfulness.
Hanson testified that, when interviewed, the father denied any type of sexual misconduct with L.B. However, he did admit to discussing sex with L.B. and also admitted that L.B. had slept in the same bed with another man whom the father and mother had picked up at a rescue mission, but whom they hardly knew. The father told Hanson that this man apparently had attempted to force L.B. to engage in oral sex with him. L.B. also described this incident to Hanson in one of their initial interviews. When Hanson questioned the mother about this, she denied knowing it occurred.
Hanson's role in this case then was transferred to a co-worker named Irene Smith. Smith testified that, as a result of DHR filing for and receiving temporary legal custody of the two children, L.B. has been in foster care with DHR and with two foster homes since May 1988. S.M.B. has been in foster care since July 1988. Smith's role was to find foster homes for the children and arrange visitation with the mother.
Smith testified that the mother worked for a brief time in Huntsville before being arrested in Alabama and later extradited to West Virginia where she served time for welfare fraud. She has since been released, now resides in West Virginia, and is unemployed.
According to Smith's testimony, L.B. began remembering that her name actually was C.L.S. and that this name change occurred, at the parents' insistence, when the family moved from Connecticut. Also, L.B. told Smith that she remembered her mother and father being in prison once before in Virginia and that, during this time, she had to stay with a lady from the church they attended.
Smith testified that S.M.B. was placed in foster care at age one and one-half because of the mother being imprisoned for welfare fraud. S.M.B. has only an assumed birth certificate and does not know that B. is not her legal surname. She has not lived with either parent since the mother's imprisonment in July 1988, has not seen her mother since that time other than the morning of this trial, and was reunited with her sister in September 1988.
Smith further testified that, although S.M.B. was not yet school age, L.B. was progressing nicely and was regaining some of her self-confidence after feeling that the family problems were in some way her fault. This more positive attitude has been caused by the reassurances of Smith, the foster family, and a therapist. Smith related at trial that, once after picking L.B. up at school, L.B. expressed to her that she was relieved that she did not have to lie anymore.
Smith described the foster parents as very loving, caring, and concerned. She also described them as a very religious family who provides for all the needs of L.B. and S.M.B., and they are willing to adopt both of them.
In assessing the long-term needs of the children, Smith testified that they need to be out of foster care and with a family they can call their own. The mother, still residing in West Virginia, has remarried, and her current husband has been assigned to a *Page 244 
work release program after being in prison. According to a home study performed by DHR's sister agency in West Virginia and introduced in a previous hearing, the mother had room in her home for the two children, but she was not considered a viable alternative due to her continued involvement with people who would place the children at a very high risk of "inappropriate behavior." Smith's overall recommendation was for L.B. and S.M.B. to be adopted.
When questioned by the trial court, Smith testified that the mother had not visited with the children since May 1990, other than on the morning of this proceeding. Also, neither parent had contributed any support to the needs of the children since September 1988.
The mother testified that she changed the name of C.L.S. to L.B. because she and the father were running from law enforcement. She admitted to being guilty of shoplifting early in her marriage with the father and to later pleading guilty to charges of welfare fraud. She also testified that, shortly after the report of sexual abuse committed against L.B., she was convinced by the father that L.B. fabricated the story. It was not until she was in jail and had time to reflect that she began believing L.B. and disbelieving him.
The mother testified that her current husband is on work release after being convicted of several charges of breaking and entering and arson. These convictions carried a term of seven to seventy years. She stated that she has no real prospects for a job at the present time because she must stay home and care for the son of her current husband. If L.B. and S.M.B. eventually were returned to her, she testified that they would be supported by the proceeds from her welfare check. The mother also testified that, although she believes her parents are still alive, she has not heard from them or her only brother for several years.
Since the trial court received this evidence ore tenus, its decision is "presumed correct and will not be disturbed on appeal unless it is so unsupported by the evidence as to be plainly and palpably wrong." D.G. v. State Dep't of HumanResources, 569 So.2d 400, 401 (Ala.Civ.App. 1990). We hold that the termination of the parental rights of the mother was supported by the evidence, that no other viable alternative existed, and that it was clearly in the best interests of the children. Accordingly, the trial court's decision is due to be affirmed.
AFFIRMED.
All the Judges concur.